UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **OMNIGEN RESEARCH, LLC AND PRINCE AGRI PRODUCTS, INC.,** | Civil Case No. 6:16-cv-268-MC |
| Plaintiffs, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| **YONGQIANG WANG, YAN ZHENG AND BIOSHEN,** | |
| Defendants. | |

**MCSHANE, Judge**:

After granting Plaintiffs' Motion for Terminating Spoliation Sanctions, finding and

ordering that a default judgment shall be entered in favor of Plaintiffs and against Defendants,

and affording the parties an opportunity to present live testimony, evidence, and argument at a

hearing conducted on October 3, 2017, the Court enters the following findings of fact,

conclusions of law, and decision regarding damages, injunctive relief, and attorneys' fees:

I.      **FINDINGS OF FACT**[1]

   A.      **Introduction**

   1.      "From 2005 to 2013, Plaintiff OmniGen Research, LLC ('OmniGen Research')

employed Defendant Yongqiang Wang as a scientist. Wang reported to Neil Forsberg, who is

OmniGen Research's co-founder, and at the time was its Vice President and Chief Scientific

Officer. In 2013, Wang worked as a consultant for Plaintiff Prince Agri Products, Inc. ('Prince

---

[1] Although the Court lists its findings of facts here, these findings merely reflect the factual allegations contained in Plaintiffs' Complaint, as is required upon an entry of default judgment. *Geddes v. United Fin'l Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (citing *Pope v. United States*, 323 U.S. 1, 12 (1944)).

Agri'), which had become OmniGen Research's parent company as of December 20, 2012, with the acquisition of OmniGen Research by Prince Agri." (Compl. ¶ 1, ECF No. 1.)

2.     "At the same time Wang worked for OmniGen Research and Prince Agri in Oregon, he breached his contracts with them by secretly creating an OmniGen Research-clone Chinese business based on stolen OmniGen Research and Prince Agri information and the infringement of their rights. That imitation business consists of at least two entities, Defendant Bioshen and the Chinese company Jiangsu Mirigen Biotechnology Development Co., Ltd. ('Mirigen')." (Compl. ¶ 2.)

3.     "While working at OmniGen Research, Wang applied for a Chinese patent that covers a knockoff of an OmniGen product. He tried to hide the application from OmniGen Research and Prince Agri, even though it rightfully belongs to OmniGen Research, by having Defendant Yan Zheng—who is Wang's wife and . . . does not have a background in biological sciences—listed as an inventor in his place. He . . . tried to hide Bioshen by listing Zheng as its representative and 'Registrant/Owner' with the Oregon Secretary of State; and he . . . tried to hide Mirigen by having another associate, Wei Zeng, listed as the registrant, administrative contact, and technical contact for the Mirigen website." (Compl. ¶ 3.)

4.     "A little more than a year after quitting OmniGen Research and Prince Agri, Wang published and took credit for OmniGen Research's product, product story and research approach as his own in a[n] … article for a[n] … overseas scientific journal. He continue[d] to use OmniGen Research information in marketing materials promoting Mirigen and Bioshen. And, in November 2015, he presented an OmniGen Research slide presentation as if it was his own at a large scientific conference in China. Many of the slides in that presentation were nearly

exact copies of the OmniGen Research slide presentation, altered only to add the Mirigen logo." (Compl. ¶ 4.)

5.    "Mirigen and Bioshen market several lines of nutritional specialty products that are knockoffs of OmniGen Research's products." (Compl. ¶ 5.)

6.    "Wang[] breach[ed] . . . two contracts with OmniGen Research and one contract with Prince Agri. Among other things, Wang has breached written agreements to return and not improperly use OmniGen Research's and Prince Agri's confidential information, to disclose and assign work-related inventions to OmniGen Research, to disclose work-related inventions to Prince Agri, and to not compete with Prince Agri." (Compl. ¶ 7.)

7.    "Zheng and Bioshen intentionally interfered with OmniGen Research's and Prince Agri's economic relations with Wang because, among other things, they intentionally helped Wang breach his promises to assign his work-related patent applications and patents to OmniGen Research and to disclose them to both OmniGen Research and Prince Agri. Zheng and Bioshen intentionally interfered with Prince Agri's economic relations with Wang because, among other things, they intentionally helped Wang to breach his contract to not compete with Prince Agri." (Compl. ¶ 8.)

**B.**    <u>**The Parties**</u>

        **1.**    **Omnigen Research And Prince Agri**

8.    "OmniGen Research, LLC is an Oregon limited liability company . . . OmniGen Research is a subsidiary of Prince Agri Products, Inc." (Compl. ¶ 13.)

9.    "Prince Agri Products, Inc. is a Delaware corporation . . . Prince Agri is a subsidiary of Phibro Animal Health Corporation ('Phibro')." (Compl. ¶ 14.)

10. "In 2002, Forsberg and Steve Puntenney co-founded OmniGen Research when Forsberg was a professor at Oregon State University ('OSU'), and Puntenney was a graduate student in Forsberg's department. It is now a successful agricultural research and development company, operating within larger corporate entities following the sale of OmniGen Research by Forsberg and Puntenney to Prince Agri in December 2012. OmniGen Research has a research laboratory in Corvallis, Oregon and a research farm south of Corvallis." (Compl. ¶ 23.)

11. "OmniGen Research's business is based on technology originally developed by Puntenney. Puntenney had determined that the cause of a common disease, called Hemorrhagic Bowel Syndrome, in lactating cows was moldy feed. Puntenney developed feed additives that help counteract this cause, and that have a variety of other beneficial effects, including strengthening and helping to maintain dairy cows' immune system, which in turn helps to prevent diseases, reducing the need for antibiotics, and increasing milk production. Forsberg advanced the technology by among other things identifying mechanisms of action and immunological markers for better understanding it." (Compl. ¶ 24.)

12. "OmniGen Research holds numerous patents around the world, including in the U.S. and China. Prince Agri and Phibro have rights to use OmniGen Research's technology. Puntenney's and Forsberg's inventions led to breakthrough and highly successful products for dairy cattle, including OmniGen-AF, OmniGen-WYC and OmniGen-Green, which are developed, made and sold by Prince Agri, and also sold by Phibro. OmniGen Research has determined that its technology would benefit other species, including pigs and poultry." (Compl. ¶ 25.)

13. "The OmniGen products have had strong sales in the U.S. and elsewhere. Phibro has recently launched those products in China. Forsberg currently works as a consultant for

Phibro, and is assisting with this product launch, including lecturing in China on scientific topics related to the OmniGen products." (Compl. ¶ 26.)

### 2. Wang And Zheng

14.     "Defendant Yongqiang Wang is a citizen of China, a legal permanent resident of the United States, and a resident of the State of Oregon, having his residence at 6255 SW Chestnut Drive, Corvallis, Oregon 97333." (Compl. ¶ 15.)

15.     "Defendant Yan Zheng is a citizen of China, a legal permanent resident of the United States, and a resident of the State of Oregon, having her residence at 6255 SW Chestnut Drive, Corvallis, Oregon 97333. (Compl. ¶ 16.)

16.     "Wang first met Forsberg when Wang was a graduate student at OSU and Forsberg was a professor. Forsberg took Wang under his wing, hiring him to work in his academic research laboratory. When OmniGen Research grew, Forsberg hired Wang in 2005 to work at OmniGen Research. Wang worked at OmniGen Research as Forsberg's right hand man for the next eight years." (Compl. ¶ 27.)

17.     "Originally from China, Wang and his wife, Zheng, built lives in Corvallis, Oregon. With OmniGen Research as their sponsors, they became legal permanent residents of the U.S. They purchased their house and a rental property in Corvallis." (Compl. ¶ 28.)

18.     "Wang apparently decided he owed no loyalty to OmniGen Research. So, while continuing to work at OmniGen Research, [Wang] . . . secretly form[ed] two businesses, Bioshen and Mirigen, to compete with OmniGen Research with the help of his wife and associates." (Compl. ¶ 29.)

### 3. Bioshen And Mirigen

19.     "[Defendat] Bioshen is . . . registered as an assumed business name for Zheng with a principal place of business at 6255 SW Chestnut Drive, Corvallis, Oregon 97333." (Compl. ¶ 17.)

20.     "Mirigen is a Chinese corporation. Mirigen's principal place of business is listed as Block 3, No. 28, Yanfeng Road, Yanqiao Supporting Area, Huisahn Economic Development Zone, Wuxi, China." (Compl. ¶ 32.)

21.     "On or about February 6, 2012, while Wang still worked at OmniGen Research, Bioshen was registered as an assumed business name for a business with the Corporation Division of the Oregon Secretary of State using an electronic registration form bearing Zheng's electronic signature. The registration form listed Zheng as the business's 'Registrant/Owner,' and Wang's and Zheng's home address as its headquarters." (Compl. ¶ 30.)

22.     "On or about April 28, 2012, the Bioshen website, www.bioshen.com, was registered, listing Zheng as the registrant but using Wang's email address and cell phone number for contact information." (Compl. ¶ 31.)

23.     "On or about September 11, 2012, while Wang still worked at OmniGen Research, Mirigen was formed." (Compl. ¶ 32.)

24.     "On or about October 21, 2012, the Mirigen website, www.mirigen.com, was registered, listing Zeng as the registrant, administrative contact, and technical contact." (Compl. ¶ 33.)

25.     "Wang has been a co-owner of Mirigen from its inception, according to official Chinese documents." (Compl. ¶ 34.) Defendants did not dispute this allegation in their responsive pleading. (SAA ¶ 34.) Wang has maintained an ownership interest and had

involvement in Mirigen despite this Court's Preliminary Injunction prohibiting it, Exs. 6-7. (*See* ECF No. 104 at 7; Preliminary Injunction, ECF No. 50, ¶ 10 ("Wang and Zheng (including Bioshen) shall no longer have any involvement with or (direct or indirect) ownership interest in Mirigen.").

26.     "Mirigen's website is mostly in Chinese; a computer translation described Mirigen as "a professional high-tech biological additives research and development, production, sales and service" business focusing on "feed additives." The website listed four products, YQ004, YQ005, YQ006, and YQ007, for aquaculture, cows, pigs, and poultry, respectively . . . . 'YQ' stands for Yongqiang, which is Wang's first name." (Compl. ¶ 36.)

27.     "In November 2015, Bioshen and Mirigen co-sponsored a scientific conference in China, attended by more than 1,000 people from academia, industry and government. Wang appeared on behalf of both companies, and Bioshen promoted itself as 'BioShen USA Corporation.'" (Compl. ¶ 37.)

28.     "Marketing materials available at the November 2015 conference in China linked Mirigen and Bioshen to each other, and included information about Bioshen USA products called 'Keligen' for pigs and poultry that employ 'the most advanced modern green agricultural technology from the United States.'" (Compl. ¶ 38.) The Plaintiffs' Contracts, Confidential Information And Copyrights

### 4.     The Contracts

29.     "On or about September 23, 2009, Wang entered into the two contracts currently at issue with OmniGen Research and in 2013 he entered into a contract with Prince Agri." (Compl. ¶ 39.) Defendants did not dispute this allegation in their responsive pleading. (SAA ¶ 39.)

30. "In the 'Confidentiality and Non-Disclosure Agreement' with OmniGen Research, Wang agreed . . . . to strict limitations on his use and disclosure of OmniGen Research trade secrets and proprietary information, and to return all material relating to OmniGen Research upon termination of his employment . . . ." (Compl. ¶¶ 40, 92.)

31. "In the 'Employee Invention Agreement' with OmniGen Research, Wang agreed, among other things, to disclose and assign to OmniGen Research all inventions that result from his work at OmniGen Research, that relate to OmniGen Research's business, or that result from using OmniGen Research resources." (Compl. ¶ 41.)

32. "Each of the two above contracts state 'I EXPRESSLY CONSENT TO VENUE IN, AND THE PERSONAL JURISDICTION OF, THE STATE AND FEDERAL COURTS LOCATED IN OREGON FOR ANY LAWSUIT ARISING FROM OR RELATING TO THIS AGREEMENT.'" (Compl. ¶ 42.)

33. "On or about February 1, 2013, following the sale of OmniGen Research to Prince Agri in December 2012, Wang abruptly quit OmniGen Research. A week later, Wang agreed to help OmniGen Research with the ensuing transition by becoming a consultant for Prince Agri. Wang executed a consulting agreement with Prince Agri on or about February 11, 2013 to memorialize his agreement with Prince Agri. Wang subsequently changed his mind about continuing as a consultant and severed his ties permanently with Prince Agri and OmniGen Research." (Compl. ¶ 43.)

34. "The 'Consulting Agreement' between Wang and Prince Agri has, among things, sections in which Wang promises to maintain the confidentiality of Prince Agri's information, and not make unauthorized use of it, to return all Prince Agri confidential information upon termination of the engagement, to disclose inventions to Prince Agri, and to not compete with

Prince Agri during the term of the agreement or for one year following termination or expiration . . ." (Compl. ¶¶ 44, 100.)

### 5. The Confidential Information And Trade Secrets

35. "While at OmniGen Research for nearly eight years, Wang had access to its trade secrets and other confidential information. Wang also had access to the trade secrets and other confidential information of Prince Agri." (Compl. ¶ 45.)

36. "As a research and development company, OmniGen Research has extensive trade secrets and other confidential information, including about OmniGen Research technology and OmniGen products." (Compl. ¶ 46.)

37. "As a product development company, Prince Agri has extensive trade secrets and other confidential information, including about OmniGen Research technology and OmniGen products." (Compl. ¶ 47.)

38. "The trade secrets and confidential information of OmniGen Research include OmniGen Research's research and experimentation methods, including its confidential comprehensive approach to testing the effectiveness of feed additives on animal populations. This approach combines, among other things, dosage amounts, intervals for measuring temporal responses, procedures for blood sampling, procedures for isolating blood cells, and assessment targets." (Compl. ¶ 48.)

39. "The trade secrets and confidential information of OmniGen Research and Prince Agri also include information about how to make OmniGen products. Since the original development of OmniGen products, OmniGen Research and Prince Agri have made numerous confidential improvements to OmniGen products, for example relating to processing aids,

ingredient sourcing, ingredient mixing procedures, the scientific motivation behind the use of certain ingredients, and precise ratios of ingredients." (Compl. ¶ 49.)

40.    "The above information has independent economic value, and has gained in value, because it is not generally known to the public or to other persons who can obtain economic value from its disclosure or use, thereby providing economic and competitive advantages to OmniGen Research and Prince Agri." (Compl. ¶ 50.)

41.    "OmniGen Research and Prince Agri have made significant efforts to maintain the secrecy of the above information. For example, OmniGen Research and Prince Agri require employees with access to the above information to sign confidentiality agreements, such as the ones signed by Wang. OmniGen Research and Prince Agri keep the above information in secure electronic storage systems, and in locked, alarmed facilities not accessible by the public or people outside their organizations." (Compl. ¶ 51.)

42.    "Efforts by OmniGen Research and Prince Agri to maintain the secrecy of the above information are and have been reasonable under the circumstances." (Compl. ¶ 52.)

### 6.    Copyright

43.    "A former professor, Forsberg's role at OmniGen Research included lecturing to veterinarians, scientists, customers and potential customers about some of the research and science behind the OmniGen products." (Compl. ¶ 53.)

44.    "Forsberg developed a core lecture, based on slides. Over the years, he gave variations of it more than 100 times to audiences across the country and internationally." (Compl. ¶ 54.)

45.　"OmniGen Research owns the copyright for these slides, and has recently obtained Copyright Registration TXu001977244 for one version of them." (Compl. ¶ 55.)

46.　Copyright Registration TXu 1-977-244 was effective on February 11, 2016 for OmniGen Research's slides "Nutritional regulation of immune function." (Ex.[2] 14.)

47.　"In his current role, in January of [2016], Forsberg lectured in China as part of the launch of OmniGen products in China." (Compl. ¶ 56.)

48.　A presentation dated March 16, 2016 on its face and found on Wang's computer contains copies or at least substantial copies of slides in OmniGen Research's copyrighted slides. (*Compare* Ex. 14 at 15, 28 and 31 *with* Ex. 15 at 3, 7 and 9.)

**C.　Wang's, Zheng's And Bioshen's Illegal Acts**

**1.　During Omnigen Research's Employment Of Wang**

49.　"Following an extended January 2012 trip to China, Wang took concrete, secret steps that went well beyond initial preparatory measures to form his OmniGen-clone Chinese business while he was employed by OmniGen Research." (Compl. ¶ 57.)

50.　"On or about February 6, 2012, as set out above, Bioshen registered as a business with the State of Oregon . . . . Wang secretly participated in the registration of Bioshen." (Compl. ¶ 58.)

51.　"That month, Wang also communicated extensively and secretly with Zeng, who is believed to have lived in New York State at the time. In one email Wang urged Zeng to look at OmniGen Research's and Prince Agri's websites to 'find anyway to get your business to start' and to 'please let me know your ideas.'" (Compl. ¶ 59

---

[2]　Unless otherwise noted, "Ex." references herein are to Plaintiffs' Exhibits lodged with the Court in advance of the October 3, 2017 hearing and pursuant to the Case Management Order, ECF No. 189.

52.     "On or about March 3, 2012, Zeng sent Wang an email with his mailing address in Setauket, New York, along with the message 'Look forward to your docs, and let's roll … rock later …'" (Compl. ¶ 60.)

53.     "Wang sent Zeng documents and a CD, including . . . confidential OmniGen Research information." (Compl. ¶ 61.)

54.     "On or about March 6, 2012, Zeng sent Wang another email stating 'Got your documents and the CD.'" (Compl. ¶ 62.)

55.     "Over the next few weeks, Zeng, Wang and a third person, Liancheng Chen spent hours communicating with each other on video calls and Internet chats." (Compl. ¶ 63.)

56.     "On or about April 28, 2012, the domain name for the Bioshen website, www.bioshen.com, was registered." (Compl. ¶ 64.)

57.     "[I]n the spring of 2012 or earlier, Wang began planning and later helped conduct an experiment on the effect of a product very similar or identical to the OmniGen products on poultry, without the knowledge or permission of OmniGen Research or Prince Agri." (Compl. ¶ 65.)

58.     "On or about September 11, 2012, Mirigen was registered as a business with the Chinese government. Wang had an ownership stake in the Mirigen business, along with Zeng, Chen, among others." (Compl. ¶ 66.)

59.     "On or about October 21, 2012, the domain name for the Mirigen website, www.mirigen.com, was registered." (Compl. ¶ 67.)

60.     "On or about October 29, 2012, a Chinese patent application was filed for a 'Natural Animal Feed Additive' with ingredients very similar to the OmniGen-WYC product. The application number was 201210420822 ('the '822 Chinese patent application'). The

application lists four inventors but Wang is not one of them. Instead, the listed inventors are Zheng (Wang's wife), Zeng, Chen, and Yu Li." (Compl. ¶ 68.)

61.     "Wang orchestrated the preparation and filing of the '822 Chinese patent application." (Compl. ¶ 69.)

62.     "[L]isting Wang's wife as an inventor on the '822 Chinese patent application was a sham. She had no substantive involvement in the application or the claimed subject matter, but Wang listed her because he wanted to ensure that ownership of the application remained in his family while decreasing the possibility that OmniGen Research would learn of his role with respect to the patent application . . . . [H]e also wanted to create a (flawed) argument that OmniGen Research did not have rights to the application under the Employee Invention Agreement [which is attached to the Complaint]." (Compl. ¶ 70.)

63.     "In November 2012, a few days after the filing of the '822 Chinese patent application, Wang took an extended and unannounced absence from work at OmniGen Research." (Compl. ¶ 71.)

64.     "In early January, 2013, Wang again took an unannounced trip of about three or four days. Soon after his return, he told Forsberg that he needed to immediately travel to China. Forsberg did not authorize that trip and Wang did not leave at that time, but about ten days later Wang again took an unannounced trip for about three days." (Compl. ¶ 72.)

65.     "On or about January 23, 2013, the '822 Chinese patent application was published (unbeknownst to OmniGen Research)." (Compl. ¶ 73.)

66.     "On or about February 1, 2013, Wang quit OmniGen Research." (Compl. ¶ 74.)

67.     "On or about February 7, 2013, Wang agreed to continue on as a consultant for Prince Agri to assist OmniGen Research transition due to his departure." (Compl. ¶ 75.)

68.     "Then, on or about February 27, 2013, Wang stopped consulting and, it was later discovered, also attempted to erase the contents of his OmniGen Research-owned computer before returning it." (Compl. ¶ 76.)

## 2. Activities After Wang Quit Working For OmniGen Research And Prince Agri

69.     "On or about July 23, 2013, the Chinese government issued to Mirigen a production license for a feed additive." (Compl. ¶ 77.)

70.     "On or about August 29, 2013, . . . Wang presented 'Effect of dietary supplementation on improvement of growth and immune function of broilers' at The 7th International Medicinal Mushroom Conference in Beijing, China." (Compl. ¶ 78.)

71.     "On or about September 17, 2013, an article 'Effect of dietary supplementation on improvement of growth and immune function of broilers' was submitted for publication in . . . *Engineering Sciences.* The article listed Chen, Zeng, Li and Wang as authors. The article described a research study of a dietary supplement product called Mirigen that has nearly identical ingredients to the product OmniGen-WYC. The article described a research approach that is a trade secret and confidential information of OmniGen Research, which includes among other things dosage amounts, intervals for measuring temporal responses, procedures for blood sampling, procedures for isolating blood cells, and assessment targets. [T]he Mirigen product described in the article was created using trade secrets and confidential information of OmniGen Research and Prince Agri, including processing aids, ingredient sourcing, ingredient mixing procedures, the scientific motivation behind the use of certain ingredients, and/or precise ratios of ingredients." (Compl. ¶ 79.)

72. "On or about October 30, 2013, a Chinese patent issued from the '822 Chinese patent application. That patent is Chinese patent no. ZL 2012 1 0420822.6 ('the '822.6 Chinese patent')." (Compl. ¶ 80.)

73. "On or about July 10, 2014, the above-described article 'Effect of dietary supplementation on improvement of growth and immune function of broilers' was published in *Engineering Sciences*." (Compl. ¶ 81.)

74. "On or about July 14, 2015, outside counsel for OmniGen Research and Prince Agri sent Wang and Zheng a letter stating, among other things, that Wang had breached his contracts with OmniGen Research and Prince Agri, and that he had misappropriated their trade secrets. The letter also demanded, among things, that Wang and Zheng return all confidential documents of OmniGen Research and Prince Agri, that they assign the Chinese patent to OmniGen Research, and that Wang cease from all Mirigen-related activities." (Compl. ¶ 82.)

75. "OmniGen Research and Prince Agri did not receive a response to this letter. However, a few days after the letter was sent, the Mirigen website was no longer accessible." (Compl. ¶ 83.)

76. "But by November 2015, the Mirigen website was again accessible, although since then most of its content has again been removed." (Compl. ¶ 84.)

77. "On or about November 13-15, 2015, Mirigen and Bioshen, along with others, sponsored a conference in China called 'The First 'International Animal and Intestinal Ecology and Health in China Summit Forum' (IAIEH).' The conference was held at Hunan Normal University, and attended by more than 1,000 people, including academics, government officials, and business leaders." (Compl. ¶ 85.)

78.     "At this conference, Wang gave a lecture titled 'Effects of immunomodulatory feed additive on the intestinal gene expression and anti-bacteria.' The lecture included the presentation of slides, the majority of which were copied from OmniGen Research's copyrighted slide presentations, created by Forsberg, which Wang had access to while at OmniGen Research and which he illegally copied and retained following termination of his engagement with OmniGen Research and Prince Agri. These slides included data from OmniGen Research studies re-styled as data from studies conducted for Mirigen." (Compl. ¶ 86.)

79.     "The slides Wang copied and retained included OmniGen Research confidential notes that are visible when the slide presentation is edited and are a part of the electronic slide document, but that are not visible when the slides are presented." (Compl. ¶ 87.)

80.     "Wang appeared at this conference as the president of Bioshen, and made numerous false statements in promoting Bioshen and Mirigen. For example, Wang represented the material copied from OmniGen Research's copyrighted slides as Mirigen's and Bioshen's, as well the innovations described therein. Bioshen and Mirigen also promoted their affiliation with 'Dr. Kevin Marley,' whom they touted as a 'Professor of Veterinary College' at Oregon State University. This also was false, as Marley [wa]s a research assistant and a laboratory manager at Oregon State University, but not a professor." (Compl. ¶ 88.)

81.     "Wang also provided an electronic version of the slides, which included OmniGen Research confidential notes, to the conference organizers, who then made electronic versions of the slides available to conference participants." (Compl. ¶ 89.)

82.     "Bioshen and Mirigen also submitted a paper, which falsely describes research, as part of their participation in the conference. The paper describes a study conducted with pigs by Bioshen and Mirigen, when in fact the studies were conducted by OmniGen Research with

regard to OmniGen products. The misrepresented studies were on sheep and dairy cattle. In other words, the paper falsely states the feed additive tested and the species involved, not to mention who actually conducted the studies." (Compl. ¶ 90.)

### 3. Breach Of Contract – Wang

83. "In consideration of including but not limited to his continued employment by OmniGen Research, Wang promised among other things [in the Confidentiality and Non-Disclosure Agreement] that he would not use OmniGen Research's 'Protected Matters,' as that term is defined in the agreement, without authorization or approval, and that he would return and not retain all documents relating to OmniGen Research and/or Protected Matters that he obtained during the course of his employment." (Compl. ¶ 92.)

84. "In consideration of including but not limited to $500, Wang promised [in the Employee Invention Agreement (attached as Exhibit B to the Complaint)] among other things to disclose to OmniGen Research every 'Invention,' as that term is defined in the agreement, resulting from work performed on behalf of OmniGen Research, to assign all right, title and interest to such Inventions, and to assist OmniGen Research in securing such rights. In the agreement, he also promised to notify OmniGen Research of the details of his employment with any future or prospective employers." (Compl. ¶ 95.)

85. "In consideration of including but not limited to his engagement as a consultant for Prince Agri, Wang promised among other things that he would not use or disclose Prince Agri's 'Confidential Information,' as that term is defined in the agreement, without authorization or approval, and that he would return all material containing, embodying or reflecting any Confidential Information. Wang also promised that during the Agreement's term, and for one year after, that he would not compete with Prince Agri's business." (Compl. ¶¶ 44, 100.)

### 4. Intentional Interference With Economic Relations – Yan Zheng And Bioshen

86. "Both OmniGen Research and Prince Agri had a business and professional relationship with Wang, as a result of among other things the aforementioned contracts." (Compl. ¶ 106.)

87. As set forth in the conclusions of law, Defendants Zheng and Bioshen interfered with Wang's performance of the contracts described above.

### 5. Trade Secret Misappropriation – Yongqiang Wang

88. "OmniGen Research's trade secrets include its comprehensive approach to testing the effectiveness of feed additives on animal populations, including among other things dosage amounts, intervals for measuring temporal responses, procedures for blood sampling, procedures for isolating blood cells, and assessment targets." (Compl. ¶ 117.)

89. "OmniGen Research's and Prince Agri's trade secrets also include improvements about how to make OmniGen products, including processing aids, ingredient sourcing, ingredient mixing procedures, the scientific motivation behind the use of certain ingredients, and precise ratios of ingredients." (Compl. ¶ 118.)

90. As set forth in the conclusions of law, Defendant Wang misappropriated Plaintiffs' trade secrets.

### 6. False Advertising - Yongqiang Wang, Yan Zheng, And Bioshen

91. "Wang, Zheng (through Bioshen) and Bioshen have made false and misleading statements in the promotion of Bioshen and Mirigen, and their products. Those statements include for example Wang and Bioshen's representation at a scientific conference that slides based on OmniGen Research's copyrighted slides are the work of Wang, Bioshen and Mirigen, and reflect their own research and analysis; a paper about research for a scientific conference that

falsely states the feed additive tested, the target animal species, and who conducted the research; and that Mirigen and Bioshen are affiliated with a 'professor' at Oregon State University." (Compl. ¶ 129.)

92.     Mirigen and Bioshen were created based on OmniGen Research's business and trade secrets.

93.     "These statements are material at least because they lend credibility to Wang, Bioshen, and Mirigen, giving them the appearance of relying on original scientific research and thinking. This additional credibility is material to the purchasing decision of a substantial segment of consumers." (Compl. ¶ 130.)

94.     "These false and misleading statements were intentionally and/or willfully designed to unfairly compete and make sales that otherwise would not have been made." (Compl. ¶ 131.)

95.     The false and misleading statements are greatly comprised of research data and trade secrets misappropriated from OmniGen Research, and falsely attributed to Mirigen, Bioshen or Mirigen products.

96.     Defendants used OmniGen Research's trade secrets, copyrighted slides, and confidential information to try to give Mirigen and Bioshen an appearance of credibility like OmniGen Research had already established for itself.

97.     "These statements were made in commercial advertising or promotion because for among other reasons they constitute commercial speech, were made by Wang, Zheng (through Bioshen) and Bioshen in an attempt to unfairly compete with OmniGen Research and Prince Agri, and were made for the purpose of influencing customers and potential customers to purchase Bioshen's Keligen products and Mirigen's YQ products." (Compl. ¶ 132.)

98.     "Plaintiffs compete with Bioshen and Mirigen. OmniGen Research's related companies Prince Agri and Phibro have rights to use OmniGen Research's technology and use it for OmniGen products, which are sold around the world, including an ongoing product launch in China." (Compl. ¶ 133.)

99.     "Bioshen claims to have Keligen products offered as 'An honored product of the Bioshen USA Corporation.' Promotion of these products rely on the same scientific concepts and boast the same benefits as OmniGen products. Bioshen claims to work closely with Mirigen, which offers YQ products that advertise nearly identical ingredients as in OmniGen-WYC, and promotion of these products rely on the same scientific concepts and boast the same benefits as OmniGen products." (Compl. ¶ 134.)

100.    "Mirigen and Bioshen market several lines of nutritional specialty products that are knockoffs of OmniGen Research's products." (Compl. ¶ 5.)

101.    "Wang's, Zheng's (through Bioshen) and Bioshen's false advertising affected interstate commerce because, among other things and on information and belief, Bioshen promotes itself as a U.S. company, attendees at the conference included people who do business in the U.S. and who represent companies that do business in the U.S., and people who review and comment on U.S. scientific research." (Compl. ¶ 135.)

102.    Due to Defendants' behavior and presentation of significant falsehoods, the award to Plaintiffs under the Lanham Act should serve as a deterrent against continued and future false advertising.

### 7.     Breach of Fiduciary Duty - Yongqiang Wang

103.    "While an OmniGen Research employee, Wang owed it fiduciary duties, including the fiduciary duty of loyalty. His fiduciary duty of loyalty included the duty to act

solely for the benefit of OmniGen Research in all matters connected with his employment." (Compl. ¶ 139.)

104.     "Wang breached the fiduciary duty he owed to OmniGen Research by, among other things, participating in filing and keeping the '822 Chinese patent application secret from OmniGen Research and taking steps to try to ensure that OmniGen Research would not obtain ownership of the application or any resulting patent, which was for a product to be sold in direct competition with Plaintiffs." (Compl. ¶ 140.)

105.     "Wang further breached the fiduciary duty he owed to OmniGen Research by, among other things, misappropriating its confidential information." (Compl. ¶ 141.)

106.     "Wang breached the fiduciary duty he owed to OmniGen Research by, among other things, using its equipment, including a computer owned by OmniGen Research, to set up competing businesses." (Compl. ¶ 142.)

107.     "Wang breached the fiduciary duty he owed to OmniGen Research by . . . using and representing as his own OmniGen Research's research and slide presentation materials, including in the promotion of the competing businesses he helped establish, Mirigen and Bioshen." (Compl. ¶ 143.)

108.     Wang was disloyal and setting up his competing businesses throughout the year 2012 up until he left OmniGen Research in early 2013.

109.     Wang was paid over $92,000 (without accounting for benefits) in 2012. (Ex. 18)

110.     Wang intentionally undermined his OmniGen Research work at the same time that he was working to set up Mirigen and Bioshen to knockoff OmniGen Research's products for the Chinese market. (McLean Witness Statement at 2.)

111. When Wang was assigned the task of obtaining and processing samples from cattle in Ione, Oregon, he knew how to complete the task correctly, but he intentionally took shortcuts that sabotaged the study. (McLean Witness Statement at 2.)

112. Wang fabricated and falsified data, and instructed a junior scientist at OmniGen Research to do the same. (McLean Witness Statement at 3.)

113. Because a number of experiments assigned to Wang included falsified data or were performed improperly, OmniGen Research reasonably elected to repeat the March 2013 through January 2014 period work for the following studies to confirm or correct the results:

    a.   University of New Hampshire OmniGen-AF rat project

    b.   University of Arizona OmniGen-AF Heat Stress Project I

    c.   OmniGen-AF Beef Free Choice Project

    d.   OmniGen-AF Goat Project I

    e.   OmniGen-AF Calf Titration study

    f.   OmniGen-AF Rat study 27

    g.   OmniGen-AF Rat study 27.2

    h.   OmniGen-AF Rat study 28

    i.   OmniGen-AF Rat study 29

    j.   OmniGen-AF Rat study 30

    k.   OmniGen-AF Rat study 31

    l.   OmniGen-AF Rat study 32

    m.  OmniGen-AF Rat study 33

    n.   OmniGen-AF Rat study 34

    o.   OmniGen-AF Rat study 35

p.   Aspergillus fumigatus analysis

(*See* McLean Witness Statement at 3-4.)

## II.   CONCLUSIONS OF LAW

### A.   Jurisdiction

114.   The Court has personal jurisdiction over the parties, which was not challenged by Defendants.

115.   The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a)-(b) and 1367.

### B.   Damages

#### 1.   General Legal Standards

116.   "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977).

117.   Plaintiffs must prove their actual damages to a reasonable degree of certainty. *Rubicon Global Ventures, Inc. v. Chongqing Zongshen Group Import/Export Corp.*, 226 F. Supp. 3d 1141, 1149 (D. Or. 2016).

118.   Where a defendant's conduct makes damages difficult to determine, however, courts allow "broad latitude" in quantifying damages. *See Domanus v. Lewicki*, 742 F.3d 290, 302-03 (7th Cir. 2014) (upholding damages where district court acknowledged plaintiffs' damages theory "was perhaps speculative," but the result of defendants' "obstructionist behavior that made business records hard to come by"); *see also Digital Filing Systems, L.L.C. v. Aditya International*, 323 Fed. Appx. 407, 418-19 (6th Cir. 2009) (unpublished) (holding that where damages are difficult to ascertain because of failure to comply with relevant discovery, "doubts about the proof should be resolved against Defendants").

119.    Although a plaintiff seeking full compensation for his injuries may plead and prove multiple causes of action, the plaintiff may not receive more than a single recovery and satisfaction for each distinct item of compensable damage supported by the evidence. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002).

### 2.    Breach Of Contract

120.    "The Confidentiality and Non-Disclosure Agreement (attached as Exhibit A [to the Complaint]) is a valid and enforceable contract." (Compl. ¶ 92.)

121.    "The Employee Invention Agreement (attached as Exhibit B [to the Complaint]) is a valid and enforceable contract." (Compl. ¶ 95.)

122.    "The Consulting Agreement (attached as Exhibit C [to the Complaint]) is a valid and enforceable contract." (Compl. ¶¶ 44, 100.)

123.    "Wang breached paragraph 2 of the Confidentiality and Non-Disclosure Agreement at least by using and disclosing OmniGen Research's Protected Matters in manners that were not authorized and/or approved by OmniGen Research." (Compl. ¶ 93.)

124.    "Wang breached paragraph 3 of the Confidentiality and Non-Disclosure Agreement at least by not returning all documents relating to OmniGen Research and/or Protected Matters, obtained by Wang during the course of his employment, and also by retaining copies of such documents." (Compl. ¶ 94.)

125.    "Wang breached paragraph 1 of the Employee Invention Agreement at least by not notifying OmniGen Research of work related to the '822 Chinese patent application, the '822 Chinese patent application, and the resulting '822.6 Chinese patent to OmniGen Research." (Compl. ¶ 96.)

126. "Wang breached paragraph 2 of the Employee Invention Agreement at least by not assigning the '822 Chinese patent application and resulting '822.6 Chinese patent to OmniGen Research." (Compl. ¶ 97.)

127. "Wang breached paragraph 3 of the Employee Invention Agreement at least by not assisting OmniGen Research to secure its rights in the '822 Chinese patent application and resulting '822.6 Chinese patent." (Compl. ¶ 98.)

128. "Wang breached paragraph 5 of the Employee Invention Agreement at least by not notifying OmniGen Research of the details of his employment with Bioshen and Mirigen." (Compl. ¶ 99.)

129. "Wang breached paragraph 4 of the Consulting Agreement at least by using and disclosing Prince Agri's Confidential Information in manners that were not authorized or approved, and also by not returning to Prince Agri all material containing, embodying or reflecting any Confidential Information." (Compl. ¶ 101.)

130. "Wang breached paragraph 5 of the Consulting Agreement at least by not informing Prince Agri of the '822 Chinese patent application and resulting '822.6 Chinese patent." (Compl. ¶ 102.)

131. "Wang breached paragraph 6 of the Consulting Agreement at least by competing with Prince Agri's business both during the term of the agreement, and in the one-year period after termination or expiration." (Compl. ¶ 103.)

132. "OmniGen Research and Prince Agri have been damaged by the above breaches and will continue to be injured by them unless Wang, and all those acting in privity with him, are ordered to return or destroy all materials in their possession, custody or control containing or

reflecting Plaintiffs' confidential information, and are ordered to make no further use of them." (Compl. ¶ 104.)

133.     In accordance with the entry of default judgment, Defendant Yongqiang Wang breached the Confidentiality and Non-Disclosure Agreement he made with OmniGen Research.

134.     In accordance with the entry of default judgment, Defendant Yongqiang Wang breached the Employee Invention Agreement he had with OmniGen Research.

135.     In accordance with the entry of default judgment, Defendant Yongqiang Wang breached the Consulting Agreement he had with Prince Agri.

136.     Plaintiffs are entitled to damages commensurate with the harms to their expectation interests under the Confidentiality and Non-Disclosure Agreement, Employee Invention Agreement, and Consulting Agreement.

137.     Although Wang's unauthorized disclosure of Plaintiffs' confidential information caused quantifiable, compensable harms to Plaintiffs, *see infra* Parts E and G, as a measure of Plaintiffs' expectation interests under the Confidentiality Agreement and paragraph 4 of the Consulting Agreement, any damages are too abstract and uncertain to quantify. Plaintiffs' proposed measure of damages—the $821,000 initial investment in Mirigen—does not reflect its expectation interest. That is, the Court cannot fairly ascertain what Plaintiffs' position would have been had Wang fully performed under the non-disclosure provisions.

138.     The requested award could be described as consequential damages, since it was surely foreseeable to Wang that disclosing large volumes of confidential information might result in lost profits or investment opportunities for Plaintiffs, but Plaintiffs specifically disclaim that they seek any consequential damages. (Pls.' Reply Br. 8, ECF No. 223.) Similarly, Plaintiffs have not requested any quasi-contractual relief based on unjust enrichment.

139. Nevertheless, Plaintiffs' measure of damages reflects its expectation interest under the Employee Invention Agreement and paragraphs 5 and 6 of the Consulting Agreement. If Wang had fully performed under the Agreements, the Chinese patent would have been assigned to OmniGen and the investment garnered by that patent and other confidential information would have accrued to Plaintiffs rather than Wang's competing business entity. These are concrete, certain, and quantifiable injuries under a contractual theory of recovery.

140. On that basis, the Court finds that Plaintiffs' requested award of **$821,000** is an appropriate measure of contractual damages.

### 3.       Intentional Interference With Economic Relations

141. "Zheng intentionally interfered with Wang's business and professional relationship with OmniGen Research by among other things assisting Wang with evading his obligation to disclose and assign the '822 Chinese patent application and resulting '822.6 Chinese patent to OmniGen Research." (Compl. ¶ 107.)

142. "Zheng provided this assistance through improper means and for an improper purpose by among other things agreeing to be listed as an inventor on the '822 Chinese patent application in Wang's place even though she was not an inventor of any alleged invention described or claimed therein." (Compl. ¶ 108.)

143. "Zheng's actions had the causal effect of damaging Wang's and OmniGen Research's business and professional relationship, and damage to OmniGen Research has resulted. OmniGen Research will continue to be injured by Zheng's action unless she is ordered to assign her entire interest in the '822 Chinese patent application and the '822.6 Chinese patent to OmniGen Research." (Compl. ¶ 109.)

144.    "Zheng intentionally interfered with Wang's business and professional relationship with Prince Agri by among other things assisting Wang in evading his obligation to not compete with Prince Agri." (Compl. ¶ 110.)

145.    "Zheng provided this assistance through improper means and for an improper purpose by among other things agreeing to be listed and maintained as the registrant for the competing business Bioshen and as the registrant and contact for Bioshen's website, and to be listed and maintained as an inventor on the '822 Chinese patent application in Wang's place even though she was not an inventor of any alleged invention described or claimed therein." (Compl. ¶ 111.)

146.    "Zheng's actions had the causal effect of damaging Wang's business and professional relationship with Prince Agri and OmniGen Research, and damage to Prince Agri and OmniGen Research has resulted." (Compl. ¶ 112.)

147.    "Zheng (through Bioshen) and Bioshen intentionally interfered with Wang's business and professional relationship with Prince Agri by among other things assisting Wang in evading his obligation to not compete with Prince Agri." (Compl. ¶ 113.)

148.    "Zheng (through Bioshen) and Bioshen provided this assistance through improper means and for an improper purpose by among other things associating with Wang even though Bioshen is a competing business with Prince Agri and OmniGen Research, and they knew or should have known of Wang's obligations to Prince Agri and OmniGen Research." (Compl. ¶ 114.)

149.    "Zheng's (through Bioshen) and Bioshen's actions had the causal effect of damaging Wang's and Prince Agri's business and professional relationship, and damage to Prince Agri has resulted." (Compl. ¶ 115.)

150.    In accordance with the entry of default judgment, Defendants Yan Zheng and Bioshen intentionally interfered with economic relations between Yongqiang Wang and OmniGen Research.

151.    Plaintiffs do not seek any damages for this intentional interference with economic relations and the Court awards none.

### 4.    Trade Secret Misappropriation

152.    "OmniGen Research and Prince Agri employ reasonable measures to maintain the secrecy of the[ir] trade secrets." (Compl. ¶ 119.)

153.    "Wang used improper means to acquire the above information from OmniGen Research because among other things he had contractually agreed not to use OmniGen Research's information unless authorized or approved by OmniGen Research, yet he used the information without OmniGen Research's authorization or approval." (Compl. ¶ 120.)

154.    "Wang misappropriated OmniGen Research's trade secrets by acquiring, using and disclosing those trade secrets without authorization and by improper means." (Compl. ¶ 121.)

155.    "Wang's misappropriation of OmniGen Research's and Prince Agri's trade secrets was willful and malicious, entitling OmniGen Research and Prince Agri to attorneys' fees and punitive damages, and has damaged OmniGen Research and Prince Agri. Plaintiffs will continue to be injured by this misappropriation unless Wang, and all those acting in privity with him, are ordered to return or destroy all materials in their possession, custody or control embodying Plaintiff's trade secrets, and are ordered to make no further use of them." (Compl. ¶ 122.)

156.    In accordance with the entry of default judgment, Defendant Yongqiang Wang misappropriated trade secrets from OmniGen Research.

157. Plaintiffs are entitled to damages that "may include both the actual loss caused by misappropriation, and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss, but shall not be less than a reasonable royalty for the unauthorized disclosure or use of a trade secret." O.R.S. § 646.465.

158. Whether deemed "actual loss," "unjust enrichment caused by misappropriation," or "a reasonable royalty for the unauthorized disclosure or use," Plaintiffs' estimate that the value of what Defendants misappropriated is no less than $821,000 is reasonably certain and a conservative valuation.

159. OmniGen Research and Prince Agri are entitled to punitive damages due to Wang's willful and malicious misappropriation of OmniGen Research's and Price Agri's trade secrets. (Compl. ¶ 122.) O.R.S. § 646.465(2) ("Upon a finding of willful or malicious misappropriation, punitive damages may be awarded in an amount not exceeding twice any [non-punitive] award.").

160. Punitive damages in the amount of $1,642,000, or twice the award for the misappropriation of the trade secrets, are warranted.

161. Based on the forgoing, the Court finds that Plaintiffs' requested base award of **$821,000** and punitive award of **$1,642,000** is appropriate compensation and deterrent for Wang's misappropriation. A total award of **$2,463,000** is therefore granted.

### 5. Copyright Infringement - Yongqiang Wang

162. "OmniGen Research owns the copyright and has a valid registration under United States copyright law, Copyright Registration TXu001977244, for original works of authorship in slides discussed above [and copied by Wang]." (Compl. ¶ 124.)

163. Defendant Yongqiang Wang infringed Plaintiffs' copyrighted work with Copyright Registration TXu 1-977-244 effective on February 11, 2016, and Plaintiffs should be

awarded statutory damages for all infringements involved in the action since the work was registered. *See* 17 U.S.C. § 504(c)(1).

164. "OmniGen Research has been injured as a result of Wang's copying and will continue to be injured by it unless Wang, and all those acting in privity with him, are ordered to return or destroy all copies of OmniGen Research's copyrighted materials and all copies of any documents that incorporate such materials, and are ordered to make no further use of any OmniGen Research copyrighted materials." (Compl. ¶ 127.)

165. Although Plaintiffs' Complaint does not request statutory damages for copyright infringement, containing only a general request for injunctive and economic relief, they are entitled to recover statutory damages for copyright infringement. 17 U.S.C. § 504(c)(1) ("[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just").

166. Plaintiffs ask the Court to award $30,000 in statutory damages for Wang's alleged willful infringement. 17 U.S.C. § 504(c)(2) ("In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.").

167. The Court must accept as true that Wang infringed upon Plaintiffs' copyright between February 11, 2016, the date on which the copyright was registered, and February 16, 2016, the date on which the Complaint was filed. *See Geddes*, 559 F.2d at 560. But it is not required to accept as true that such infringement, or the alleged infringement post-dating the

Complaint, was committed willfully—that allegation is not contained in the Complaint.

168.    Plaintiffs do not show that they are entitled to more than the statutory minimum in damages for this brief period of infringement.

169.    Based on the foregoing, the Court finds that **$750** is an appropriate and just measure of damages for copyright infringement.

### 6.    Lanham Act And False Advertising

170.    Plaintiffs are entitled to damages or equitable relief under 15 U.S.C. § 1117(a), including profits.

171.    Defendants' discovery abuse and spoliation of evidence related to damages prevents a precise calculation of Defendants' profits.

172.    Because Plaintiffs are unable to calculate Defendants' profits due to Defendants' discovery abuse and spoliation, it is equitable to award Plaintiffs the $821,000 as the value of Mirigen. *Accord Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274-75 (9th Cir. 1982) (finding that, if only nominal damages are imposed under the Lanham Act, then "enforcement would fail to serve as a convincing deterrent").

173.    After entering default for egregious litigation conduct, treble damages may be awarded under the Lanham Act if the allegations in the complaint support it. 15 U.S.C. § 1117(a) (granting courts discretion to treble actual damages or "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case"); *see also Taser Int'l, Inc. v. Phazzer Elecs., Inc.*, No. 6:16-cv-366-Orl-40KRS, Slip Op. at 7 n.4 (M.D. Fla. July 21, 2017) (awarding treble damages after entering default for litigation misconduct where the plaintiff alleged that the defendant "intentionally engaged in false advertising" because the plaintiff's "allegations are accepted as true by virtue of the default judgment").

174.    Plaintiffs were harmed by Defendants making false efficacy claims for its own

product based (solely) on the research performed by Plaintiffs. In doing so, Defendants effectively usurped the nascent Chinese market, causing actual harm to Plaintiffs and undue profit for Defendants.

175. Defendants—or, at least Wang—knew that he was passing off as his own the materials that underscored the very credibility of Defendants' business.

176. As is common in such false advertising cases, quantifying damages is difficult (especially where evidence has been systematically destroyed by the defendant).

177. Here, Plaintiffs quantified such damages at $821,000, a reasonable estimation given the extensive spoliation of evidence. (*See* Spoliation Opinion and Order, ECF No. 182.)

178. Plaintiffs further request that any compensatory award include Defendants' head start and avoided costs of conducting the scientific studies they used in false advertising. (Pls.' Br. 14-18, ECF No. 195.) Those avoided costs are estimated at $80,000. (*Id.* Ex. 2, Voth Report ¶ 33, Schedule 4 at 19.)

179. The Court disagrees with Plaintiffs that counting avoided costs as actual damages is appropriate under the circumstances.

180. The Court is already awarding Plaintiffs the initial $821,000 investment in Mirigen—the full known benefit gained by Defendants and the best available estimation of the actual competitive harm suffered by Plaintiffs. Requiring Defendants to pay damages which do not attempt to compensate Plaintiffs and which go beyond disgorging the wrongly-acquired investment is more punitive in nature.

181. Although, as discussed *infra*, Plaintiffs may have suffered greater than $821,000 in economic harms, the Lanham Act does not allow for punitive damages and provides a

discretionary enhancement mechanism based on equitable considerations. The Court therefore declines to award Plaintiffs the estimated $80,000 in costs avoided by Defendants.

182.    Nevertheless, the $821,000 actual damages award—which the Court agrees is a conservative proxy for ultimate profits from the venture, whether those lost by plaintiffs or gained by defendants—should be enhanced to $2,463,000. *See* 15 U.S.C. § 1117(a).

183.    Enhancing damages is justified by Defendants' conduct. Defendants' "false and misleading statements were intentionally and/or willfully designed to unfairly compete and make sales that otherwise would not have been made." (Compl. ¶ 131.) *See Taco Cabana Int'l Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ("An enhancement of damages may be based on a finding of willful infringement, but cannot be punitive").

184.    Enhancing damages here would help fully compensate Plaintiffs for the harm caused by Defendants, not penalize Defendants. *See Taco Cabana Int'l Inc.*, 932 F.2d at 1127 ("[E]nhancement could, consistent with the 'principles of equity' promoted in section 35 [of the Lanham Act], provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, *particularly where the imprecision results from defendant's conduct*.") (internal citations omitted) (emphasis added).

185.    The statute is designed to allow a court to provide just compensation for an injured plaintiff where the amount found as actual damages fails to do so. *See, e.g., U-Haul Int'l, Inc. v. Jartran, Inc.*, 601 F. Supp. 1140, 1150 (D. Ariz. 1984) (awarding $20 Million of enhanced damages where plaintiff "sustained damages above and beyond those actually awarded"), *aff'd in relevant part, modified in part and rev'd in part*, 793 F.2d 1034, 1041-42 (9th Cir. 1986).

186.    Here, the damages were conservatively calculated, based on very limited

evidence. The limitations of the evidence were largely due to the destruction of evidence by Defendants. An enhanced award of $2,463,000 would better align with Plaintiffs' harm.

187. The statute does not proscribe limits on the type of uncompensated harm that a court can evaluate to exercise its discretion, or any level of precision that need be established to determine the amount of enhancement. Instead, it cites the "principles of equity" and caps awards at treble compensatory damages. 15 U.S.C. § 1117 (a).

188. Consistent with the principles of equity, courts have exercised broad discretion to address a variety of undercompensated harm, including where there is difficulty assessing damage, and where lost profits are insufficient to address the on-going harm. *See*, *e.g.*, *Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1183 (C.D. Cal. 2011) ("[P]otential harm from lingering misimpressions that is unlikely to be fully captured by the lost profits"); *Playboy Enterps., Inc. v. P. K. Sorren Exp. Co. Inc. of Fla.*, 546 F. Supp. 987, 998 (S.D. Fla. 1982) ("[T]here must have been some harm to PEI's goodwill and reputation.").

189. Moreover, in the exercise of the Court's discretion, it is proper to also consider that enhancing damages would advance the cause of deterring Defendants and others similarly situated from repeating the type of unfair and deceptive behavior. *See Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1347 (7th Cir. 1994) ("[C]ourts have required the final remedy imposed under Section 35(a) [of the Lanham Act] provide a sufficient deterrent to ensure that the guilty party will not return to its former ways and once again pollute the marketplace."); *PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999) ("15 U.S.C. § 1117(a) confers authority on the court to treble defendant's profits in the event that compensatory damages are inadequate to deter future infringing conduct.").

190.     As noted above, these Defendants—in both their underlying conduct and their litigation conduct—have shown repeated disregard for Plaintiffs' rights, the law, and this Court's orders. Enhancing damages to fully compensate Plaintiffs will have an important deterrent effect.

191.     The Court therefore finds it to be just under the circumstances of this case to award increased damages resulting from false advertising, passing off, and unfair competition under the Lanham Act.

192.     According to the circumstances of this case, increased damages are proper. The Court thus awards **$821,000** in actual damages and concludes, based on the only available evidence, that this award should be tripled for deterrence (not a penalty) to a total award of **$2,463,000**. *See* 15 U.S.C. § 1117(a).

### 7.     Breach of Fiduciary Duty

193.     Wang owed a duty of loyalty while employed as a scientist at OmniGen Research from 2005 to 2013. (Compl. ¶¶ 1, 139.)

194.     "At the same time Wang worked for OmniGen Research and Prince Agri in Oregon, he breached his contracts with them by secretly creating an OmniGen Research-clone Chinese business based on stolen OmniGen Research and Prince Agri information and the infringement of their rights." (Compl. ¶ 2.)

195.     Wang's "imitation business consisted of at least two entities, Defendant Bioshen and the Chinese company Jiangsu Mirigen Biotechnology Development Co., Ltd. ('Mirigen')." (Compl. ¶ 2.)

196.     "Mirigen and Bioshen market several lines of nutritional specialty products that are knockoffs of OmniGen Research's products." (Compl. ¶ 5.)

197.    "Wang breached the fiduciary duty he owed to OmniGen Research by, among other things, using its equipment, including a computer owned by OmniGen Research, to set up competing businesses." (Compl. ¶ 142.)

198.    Further, "Wang breached the fiduciary duty he owed to OmniGen Research by, among other things, using and representing as his own OmniGen Research's research and slide presentation materials, including in the promotion of the competing businesses he helped establish, Mirigen and Bioshen." (Compl. ¶ 143.)

199.    "Wang's breach of fiduciary duty has damaged and is continuing to damage OmniGen Research." (Compl. ¶ 144.)

200.    "Wang's actions may have already created customer confusion in the marketplace about the origin and ownership of OmniGen Research technology, and [unless] Wang is stopped and his actions corrected, they pose a substantial risk of creating more confusion." (Compl. ¶ 144.)

201.    OmniGen Research was directly harmed by Wang's breaches of fiduciary duty by having to repeat or re-create certain research projects on which Wang had worked while Wang was plotting to start rival businesses, Mirigen and Bioshen.

202.    The reasonably certain cost to OmniGen Research to re-create or repeat research projects because of Wang's breaches of fiduciary duty is $252,000. (*See* Voth Report Schedule 3.)

203.    The "Restatement [of Agency] provides for the recovery of all compensation paid to an employee during a period of disloyalty as damages." *HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 955 (D. Ariz. 2013). Oregon law is consistent with this approach. *Am. Timber & Trading Co. v. Niedermeyer*, 558 P.2d 1211, 1123 (Or. 1976) "([A] corporate officer who engages in

activities which constitute either a breach of his duty of loyalty or a willful breach of his contract of employment is not entitled to any compensation for services rendered during that period of time even though part of those services may have been properly performed.").

204.    Wang was disloyal and setting up his competing businesses throughout the year 2012 up until he left OmniGen Research in early 2013.

205.    Had Wang honored his duty of loyalty to OmniGen Research by disclosing his activities, it is reasonable to assume that OmniGen Research would not have continued to pay him, so an award of damages for Wang's salary directly flows from the breach of his duty of loyalty. *Boley*, 954 F. Supp. 2d at 956.

206.    Based on the foregoing, the Court finds that Plaintiffs are entitled to the **$92,000** salary paid to Wang and the **$252,000** cost of re-creating or repeating research projects. Total damages for Wang's breach of fiduciary duty are therefore **$344,000**.

### 8.    Summary of Findings on Damages

207.    Wang breached his contractual obligations, misappropriated trade secrets, and violated the Lanham Act with the other named defendants. An award of $821,000 is independently supported by each of these three causes of action. Plaintiffs estimate that $821,000 is equal to the approximate initial investment in Mirigen by its original shareholders. (*See* Voth Report ¶ 29.) Nothing was provided in discovery to offset or otherwise reduce that total investment as being the minimum valuation of what was misappropriated from Plaintiffs. (*See* Voth Report ¶¶ 27-31.) Since Plaintiffs are limited to a single recovery, they are entitled to **$821,000** for breach of contract, misappropriation of trade secrets, and false advertising.

208.    Wang breached his duty of loyalty while setting up his competing businesses throughout the year 2012 up until he left OmniGen Research in early 2013. Wang was paid over $92,000 in 2012 (without accounting for benefits) and the estimated cost to OmniGen Research

to re-create or repeat research projects mishandled by Wang is $252,000. (*See* Voth Report Schedule 3.) Plaintiffs are thus entitled to **$344,000** for Wang's breach of fiduciary duty.

209.    Defendants infringed upon the copyright of OmniGen Research's copyrighted slides, Copyright Registration TXu 1-977-244. Plaintiffs are entitled to **$750** for these violations.

210.    Due to the severity of Defendants' intentional misappropriation, the Court further finds that Plaintiff qualifies for enhanced damages under the Lanham Act and punitive damages under O.R.S. § 646.465(2). An additional award of **$1,642,000** is independently supported by each of these two causes of action.

211.    After enhancing damages, the Court finds it just that judgment for damages of **$2,807,750** should be entered against Wang. The Court finds it just that Bioshen and Zheng should be held jointly and severally liable for **$2,463,750** of the $2,807,750. This $2,463,750 reflects the treble damages attributable to Bioshen and Zheng's involvement with Mirigen and the misappropriation of studies and research performed by OmniGen.

## C.    <u>Injunctive Relief</u>

### 1.    General Legal Standards

212.    As stated previously, "[t]he general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes* 559 F.2d at 560.

213.    A court may only grant a permanent injunction if a plaintiff demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (internal citations omitted).

214.    A defendant's voluntary cessation of cessation of activity is not a ground for the denial of a permanent injunction. *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986) (holding that it was an abuse of discretion for a district court to refuse to grant a permanent injunction based on plaintiff's failure to produce evidence demonstrating that defendant planned to sell the objectionable items); *see also Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir 1984) (granting a preliminary injunction even though the defendant voluntarily stopped use of the infringing mark).

215.    "An injunction should be tailored to eliminate only the specific harm alleged, but it should not be so narrow as to invite easy evasion." *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) (internal citations and quotation marks omitted).

216.    "A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

### 2.    Analysis

217.    This Court has the discretion to grant a permanent injunction pursuant to its equitable powers, *see eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, 391 (2006), and, with respect to false advertising, the Lanham Act, *see* 15 U.S.C. § 1116(a).

218.    In accordance with this authority, the Court finds that Plaintiffs have carried their burden and demonstrated all four prongs of the requisite test for permanent injunctive relief.

#### a.    Irreparable Injury

219.    Plaintiffs have been irreparably harmed by Defendants' conduct and will be irreparably harmed if Defendants are not enjoined from disclosing Plaintiffs' trade secrets and confidential information, as well as ordered to take steps to remedy any prior disclosure.

220.     As the Court previously noted in its Preliminary Injunction Revised Order, the disclosure or threatened disclosure of trade secrets or even non-trade secret confidential information is "sufficient to meet the irreparable injury requirement for a preliminary injunction." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); *Union Pacific R.R. Co. v. Mower*, 219 F.3d 1069, 1071 n.1 (9th Cir. 2000); and *Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 142 (9th Cir. 1965)).

221.     The consumer confusion, loss of good will, and increased market place barriers which can result, and, in this case, have resulted, from false advertising are also sufficient to meet the irreparable injury requirement. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997).

222.     As such, Plaintiffs have carried their burden of demonstrating irreparable injury.

b.  Inadequate Remedies Available at Law

223.     Despite this Court's award of monetary damages, remedies at law are inadequate to compensate for Plaintiffs' injuries.

224.     The disclosure of Plaintiffs' confidential information and Defendants' false representations have resulted in difficult to quantify injuries including consumer confusion, loss of good will, increased market place barriers, and unfair competition. These harms are ongoing and may continue or worsen if Defendants are not enjoined from engaging in related conduct.

225.     Moreover, as a result of Defendants' extensive spoliation, Plaintiffs more concrete injuries, such as lost profits, have been made difficult to calculate.

226.     An award of monetary damages is thus insufficient to remedy Plaintiffs' injuries.

c. <u>Balance of Hardships</u>

227.    The balance of hardships also weighs in favor of Plaintiffs.

228.    Defendants have no right to continue using Plaintiffs confidential information or engaging in false advertising. In general, "there is no harm to a defendant from an injunction with prevents continuing dissemination of false statements." *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. CV 14-03954 DDP MANX, 2014 WL 4187982, at *5 (C.D. Cal. Aug. 22, 2014) (citations and quotation marks omitted).

229.    Similarly, Wang contracted with Plaintiffs to maintain confidentiality and assign the Chinese patent in question—these are terms voluntarily agreed to by Wang and not terms crafted by the Court from whole cloth.

230.    Defendants will therefore suffer minimal hardship in being enjoined from using and possessing Plaintiffs' confidential information, engaging in further false advertising, and continuing to hold the wrongfully acquired patent rights.

231.    Plaintiffs, by contrast, have and will continue to suffer hardship if their trade secrets and other confidential information are used by Defendants and Defendants maintain their pattern of disobeying the Court's orders.

232.    The balance of hardships therefore tips in favor of Plaintiffs.

d. <u>Public Interest</u>

233.    Finally, an injunction will serve the public interest in fair competition, enforcement of contract rights, and truthful advertising.

234.    There is "a public interest in upholding the law and contracts, and having parties abide by their legal duties." *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1229 (D. Or. 2016); *C & C Prop., Inc. v. Shell Co.*, No. 1:14-CV-01889-JAM, 2015 WL

5604384, at *12 (E.D. Cal. Sept. 23, 2015); *Certified Restoration Dry Cleaning v. Tenke Corp.*,

511 F.3d 535, 551 (6th Cir. 2007).  "There is [also] a strong public interest in preventing false

advertising of products in the marketplace." *Homeland Housewares*, 2014 WL 4187982 at *6.

235.    An injunction will therefore serve the public interest.

###    3.    Scope

236.    As the record reflects, Defendants have repeatedly violated the Court's orders and

engaged in conduct harmful to Plaintiffs. (*See, e.g.*, Spoliation Opinion and Order 9 (noting that

Wang's conduct taking his laptop to China was a violation of the Preliminary Injunction order);

*id.* at 11, 16 (noting that destruction of evidence was in violation of the Court's orders); *id.* at 17

(noting that Zheng's donation of a desktop computer to Goodwill was admitted by Defendants to

violate the Court's preliminary injunction order).)

237.    In turn, the Court finds that, in order to prevent further violations and bad faith

conduct, any injunctive relief must be supported by sufficiently strong enforcement mechanisms

and incentives for faithful compliance.

238.    The following discussion summarizes and offers support for the specific

provisions contained in the Court's permanent injunction, provided *infra*.

####    a.    Confidential Information and Trade Secrets

239.    As a result of Wang's breach of contract with regard to his misuse of confidential

and trade secret information, his trade secret misappropriation, and Zheng and Bioshen's

interference with Wang's contracts, Defendants are enjoined from possessing, using, or

distributing Plaintiff's confidential information or trade secrets, ordered to demand that their

associates return Plaintiff's information, and ordered not to have any involvement in Bioshen or

Mirigen. *See infra* ¶¶ 269-72.

240.    The Court finds that merely prohibiting Defendants' further use of Plaintiffs' information would be insufficient given the willfulness of Defendants' underlying conduct and behavior in the present litigation.

241.    Defendants have raised no objections to these terms. (*See* Dfs.' Resp. Br. ¶ 1, ECF No. 206.)

242.    The Court, however, declines to grant Plaintiffs' request for an expansive provision prohibiting Defendants from working for certain types of feed industry businesses. In general, courts are skeptical of restraints on trade when voluntarily entered into by private parties and a court-imposed restraint would require the highest order of justification. The proposed restraint would be burdensome, overbroad, and unfairly limit Defendants' ability to satisfy the judgment in this case. Plaintiffs have ample enforcement mechanisms to ensure that Defendants comply with the terms of the injunction in their professional pursuits—targeting those professional pursuits directly is unfair and unwarranted.

b.    <u>False Advertising</u>

243.    Defendants are further enjoined from engaging in false, deceptive, or misleading advertising as it relates to products in the feed additive industry. *See infra* ¶ 273.

244.    "Courts routinely grant permanent injunctions prohibiting deceptive advertising." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 (9th Cir. 2011). "Nothing is clearer in the law of commercial speech than that false or misleading commercial speech is 'clearly subject to restraint.'" *ITEX Corp. v. Glob. Links Corp.*, 90 F. Supp. 3d 1158, 1174 (D. Nev. 2015) (quoting *U–Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986)).

245.    Furthermore, under the Lanham Act, "advertising may be enjoined if it 'contain[s] misrepresentations or create[s] a reasonable likelihood that purchasers will be confused as to the

source, identity, or sponsorship of the advertiser's product.'" *Slep-Tone Entm't Corp. v. Grillhouse, Inc.*, No. 6:13-CV-02016-MC, 2015 WL 12880560, at *5 (D. Or. Jan. 30, 2015) (quoting *Smith v. Chanel*, Inc., 402 F.2d 562, 563 (9th Cir. 1968)).

246.    Defendants object to this term by alleging that the "Lanham Act has never been mentioned in this action." (Defs.' Resp. Br. ¶ 2.) That is simply not true. (*See* Compl. ¶ 11). As outlined *supra*, Wang's advertising of his Mirigen and Bioshen companies was deceptive and contained misrepresentations in violation of the Lanham Act.

247.    A provision enjoining further false advertising is therefore appropriate.

### c. Patent Assignment

248.    Defendants must assign to Plaintiffs all interest they have in the Chinese patent and application, as well as register the assignment with the Chinese government. *See infra* ¶ 274.

249.    Precedent both within and outside the Ninth Circuit supports such assignment. *See, e.g.*, *Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 145 (9th Cir. 1965) (affirming a district court's order that patent applications be assigned to an employer where an agreement required their assignment); *Ethicon Endo-Surgery, Inc. v. Crescendo Techs., LLC*, No. 1:07CV1016, 2009 WL 2707805, at *7 (S.D. Ohio Aug. 24, 2009) ("Where intellectual property has been found to be misappropriated through a patent application, it is appropriate equitable relief to reassign the application.").

250.    Defendants do not oppose assigning the patent and application to Plaintiffs. (Defs.' Resp. Br. ¶ 3.)

251.    The Court therefore finds assignment to be appropriate.

### d. Production of Electronic Media

252. Defendants are also ordered to produce their electronic media to Plaintiffs for review and to provide an affidavit and documentary evidence to verify their compliance with the terms of this injunction. *See infra* ¶¶ 275-76.

253. "[T]he existence of an injunction does not guarantee compliance with its terms, particularly if there is no means to verify compliance." *Gen. Elec. Co. v. Liang*, No. CV 13-08670 DDP VBKX, 2014 WL 1089264, at *4 (C.D. Cal. Mar. 19, 2014); *see also United States v. Viray*, No. 12-CV-1016-GW, 2012 WL 759884, at *2 (C.D. Cal. Feb. 13, 2012) (allowing "post-judgment discovery to ensure compliance" with the terms of the injunction).

254. Defendants object that they have already provided all electronic data and media to Plaintiffs. (Dfs.' Reply Br. ¶ 4.)

255. The purpose of the production provision, however, is to ensure continued compliance with the Court's orders—past production does not ensure future compliance. Moreover, prior production has shown possession of Plaintiffs' confidential information.

256. Defendants have demonstrated a willful failure to comply with the Court's orders regarding production of electronic data. These provisions will help to ensure compliance moving forward.

### e. Security Interest

257. Defendants are also ordered to record a security interest in their property to ensure ongoing compliance with this injunction. Plaintiffs may foreclose on this interest only if the Court makes a finding that Defendants have engaged in a bad faith violation of paragraphs 274 to 279 of the injunction. *See infra* ¶ 277.

258.     The Court finds that such a provision is necessary to ensure that Defendants Wang and Zheng, believed to be Chinese nationals and who have been building a business in China, do not dissipate assets or otherwise frustrate Plaintiffs' ability to recover effective monetary or injunctive relief by liquidating their assets and returning to China.

259.     Defendants object on the grounds that this provision "appears to be unnecessary and constitutes overreach." (Dfs.' Reply Br. ¶ 5.)

260.     As discussed above, Defendants' lack of trustworthiness and prior failure to comply with Court orders indicate that such security is necessary to ensure their continued compliance with the terms of the injunction. *See, e.g.*, *F.T.C. v. Satellite Broad. Corp.*, No. CIVSACV95336LHM(EEX), 1996 WL 87056, at *8 (C.D. Cal. Jan. 16, 1996) (ordering that a security interest in real property be recorded for the benefit of the plaintiff, to serve as security for defendants' agreement to pay monetary damages).

261.     The term, importantly, is limited only to bad faith violations and applies only to those provisions specifically enjoining the underlying conduct for which Defendants have been found liable. It does not apply to violations of the production and reporting requirements, discussed *infra*.

### f.   Violations and Production of Electronic Media

262.     Defendants must produce their electronic devices to the Court within two days if Plaintiffs provide evidence demonstrating that it is more likely than not that Defendants have violated any provisions of the permanent injunction. *See infra* ¶ 278.

263.     This provision is, like the other enforcement mechanisms, warranted due to Defendants' conduct in this case and the need to verify ongoing compliance.

264.    Defendants object that this provision lacks procedural safeguards and requires production based on mere allegations. (Defs.' Reply Br. ¶ 6.)

265.    The Court agrees that Plaintiffs proposed evidentiary standard—"reasonable possibility" of a violation—was too low. A preponderance of the evidence standard is more appropriate.  The Court is satisfied that production of electronic media to the Court and not directly to Plaintiffs is an adequate safeguard.

g.    Territorial Reach

266.    The Court's injunction applies worldwide. *See infra* ¶ 279.

267.    Since Defendants' wrongful actions have included conduct occurring in China—including starting a competing Chinese business, filing a Chinese patent, and speaking at a conference in China using OmniGen's copyrighted slides—a worldwide injunction is appropriate and necessary to accord Plaintiffs meaningful relief. *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (finding a worldwide injunction appropriate in certain cases of trade secret misappropriation and always appropriate in impacted foreign markets).

4.    **Specific Terms**

268.    On the basis of the foregoing, and good cause otherwise appearing therefor, the Court issues a permanent injunction enjoining Defendants as follows:

a.    Protecting Plaintiffs' Confidential Information

269.    Defendants and their agents, servants, employees and all persons and entities acting in privity, concert or participation with them, shall not possess, use, or distribute Plaintiffs' nonpublic information or trade secrets.

270.    Wang shall send written demands to all former and current personnel, officers, owners, and customers of Jiangsu Mirigen Biotechnology Development Co., Ltd. ("Mirigen") that they return all of Plaintiffs' information (including any Mirigen or Bioshen documents that

contains such information). All references in this injunction to Mirigen will also include any business that is a successor entity to Mirigen.

271.     Defendants shall not have any involvement with or ownership interest in Mirigen, either directly or indirectly. "Involvement" includes but is not limited to being employed by Mirigen, consulting with or advising Mirigen, or marketing for or promoting Mirigen.

272.     Wang and Zheng shall not have any involvement with or ownership interest in Bioshen, either directly or indirectly. For example, they may not be employed by Bioshen, consult with or advise Bioshen, or market for or promote Bioshen. Further, Wang and Zheng shall file a cancellation of Bioshen's Assumed Business Name registration with the Oregon Secretary of State within 30 days of the entry of this order, and shall at no time take steps to form a new entity by that name or use that name.

### b. Preventing Further False Advertising

273.     Defendants and their agents, servants, employees and all persons and entities acting in privity, concert or participation with them, shall not: (1) falsify any of their credentials, or the credentials of any entity or person affiliated with them, when engaged in any activity related to feed additives; (2) falsely or deceptively represent that any feed additive product has benefits similar to OmniGen products, including that it supports or enhances immune function, reduces metabolic disorders, or improves milk quality, or (3) falsely or deceptively represent that research done on any OmniGen product reflects or predicts the performance of another product.

### c. Enforcing Employee Invention Agreement

274.     Using the form attached hereto, Wang and Zheng shall assign any and all interest they have in Chinese patent no. ZL 2012 1 0420822.6 and Chinese application number 201210420822 to Prince Agri Products, Inc., within 5 days of the entry of this order. Within 45

days of this order, Wang and Zheng shall file the executed assignment for registration at the patent administration department under the State Council in China, pursuant to Article 10 of Chapter 1 of the Patent Law of the People's Republic of China.

d. Ensuring Compliance with Injunctive Relief

275.    Wang and Zheng shall file an affidavit with the Court within 60 days of the entry of this injunction, which describes and attaches all documents related to their efforts to comply with the injunction, including all efforts to retrieve Plaintiffs' information and proof that the Mirigen interests have either been sold or have otherwise been terminated and that the Bioshen name has been cancelled.

276.    Defendants shall within 45 days of the entry of this order produce to Plaintiffs all electronic media in their custody, possession or control (including but not limited to all personal or household electronic devices and storage, including duplicates) for purposes of verifying that they do not contain Plaintiffs' confidential and/or copyrighted material.  Plaintiffs shall return the electronic media as soon as possible and not later than 10 business days of receipt.

277.    In order to provide Plaintiffs with security that Defendants will comply with the other terms of this injunction, Wang and Zheng, within 30 days of the entry of this order, shall record with the Benton County Clerk a $500,000 security interest in favor of Plaintiffs in the residence at 6255 SW Chestnut Drive, Corvallis, Oregon 97333 that will expire in 5 years or at such earlier time as the Court orders.  Until this security interest expires, Plaintiffs shall have the right to foreclose on this security interest if the Court determines that Wang or Zheng has in bad faith violated any portion of Part A, B, or C of this permanent injunction.  The parties may agree that this security interest may be transferred to another property of equal or greater value should Wang and Zheng desire to move.

278. Wang and Zheng shall produce to the Court all of their electronic devices and storage within two days of Plaintiffs establishing to the satisfaction of the Court that it is more likely than not that either Wang or Zheng has violated any of the terms of this order.

279. This injunction applies worldwide and will last five years.

280. The Court retains non-exclusive jurisdiction to enter such orders as may be necessary to enforce the Court's judgment in this matter.

### D. Attorneys' Fees and Costs

#### 1. Legal Bases for Awarding Attorneys' Fees and Costs

281. Plaintiffs are entitled to attorneys' fees and costs pursuant to the Lanham Act, 15 U.S.C. 1117(a), Oregon Trade Secrets Act, ORS § 646.467, and Fed. R. Civ. P. 37(b)(2)(C).

##### a. Lanham Act—Fees and Costs

282. Plaintiffs are entitled to their attorneys' fees and costs under the Lanham Act, 15 U.S.C. § 1117(a).

283. Under § 1117(a), a court may "award reasonable attorney fees to the prevailing party" in "exceptional cases." The Supreme Court has held that "an exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

284. The Court finds that both bases for awarding fees are easily satisfied in light of the default judgment and the conduct leading to its entry.

285. The Complaint's allegation that Defendants engaged in intentional and willful false advertising is, on its own, sufficient to establish the substantive weakness of Defendants' litigation position. *See Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir.

2008) (finding that because "[t]he district court entered default [and] all factual allegations in the complaint are deemed true, including the allegation of Poof's willful infringement of Andrew's trademarks," the "default sufficiently establishes . . . entitlement to attorneys' fees under the Lanham Act"); *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1023 (9th Cir. 2002) (holding that, after discovery sanction default judgment, case was "exceptional" under § 1117(a) because the complaint alleged that defendant's acts were committed "knowingly, maliciously, and oppressively, and with an intent to . . . injure [plaintiff]").

286.    Defendants also litigated this case in an unreasonable manner. The record contains numerous instances of unreasonable conduct by Wang, including an attempt to evade service by lying to the process server, an initial default, discovery violations, and a destruction of evidence beyond anything previously witnessed by this Court. (*See* Spoliation Opinion and Order (describing Wang's misconduct at length).)

287.    Plaintiffs are also entitled to "the costs of the action" under the Lanham Act.

288.    Plaintiffs move for a total of $57,030.67 in costs for filing, service, hearing transcripts, depositions, forensic analysis and experts, a damages expert, translations, and lodging. (Pls.' Motion for Fees and Costs 21, ECF No. 193.)

289.    Under § 1117(a), Plaintiffs may recover costs including and in addition to those "taxable costs" permitted under 28 U.S.C. § 1920. *See, e.g.*, *World Triathalon Corp. v. Dunbar*, 539 F. Supp. 2d 1270, 1290 (D. Haw. 2008) ("While none of these costs are expressly provided for in § 1920, the more general clause in § 1117(a) entitles Plaintiff to an award of the remaining costs."); *see also Secalt S.A. v. Wuxi Shenxi Const. Mach. Co., Ltd.*, 668 F.3d 677, 690 (9th Cir. 2012) (holding that "attorney's fees under the Lanham Act may also include reasonable costs that the party cannot recover as the 'prevailing party'" as long as such costs are reasonably

incurred) *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).

290.     Defendants object that Plaintiffs cannot recover attorneys' fees or costs under the § 1117(a) because the Lanham Act is not contained in the Complaint and otherwise inapplicable. As stated *supra*, that is simply not true. (*See* Compl. ¶ 11).

b.   Oregon Trade Secrets Act—Fees

291.     In the alternative, Plaintiffs are entitled to their attorneys' fees under the Oregon Trade Secrets Act, ORS § 646.467.

292.     Under ORS § 646.467, a court "may award reasonable attorney fees to the prevailing party if . . . [w]illful or malicious misappropriation is found by the court." In determining the propriety of such an award, a court must weigh the factors set forth in ORS § 20.075. *See* ORS § 20.075 ("A court shall consider the following factors in determining whether to award attorney fees in any case in which an award of attorney fees is authorized by statute and in which the court has discretion to decide whether to award attorney fees . . . ."); *see also Precision Automation, Inc. v. Tech. Servs., Inc.*, No. CIV. 07-707-AC, 2010 WL 1051009, at *1 (D. Or. Feb. 16, 2010) (considering the factors contained in ORS § 20.075).

293.     Plaintiffs satisfy the facial requirements of ORS § 646.467. In particular, as a result of the default judgment, Plaintiffs are the prevailing party in the present action and the Court credits as true that "Wang's misappropriation . . . was willful and malicious." (Compl. ¶ 122.) *See Wright v. Bloom*, No. C 12-00746 WHA, 2013 WL 4517727, at *5 (N.D. Cal. Aug. 22, 2013) (awarding attorneys' fees in a default judgment based on allegations in the complaint stating that the defendant's "misappropriation was willful and malicious").

294.     The factors outlined in ORS § 20.075 also support an award of attorneys' fees.

295.     The first factor, whether Defendants' conduct was "willful or malicious," ORS § 20.075(1)(a), is already established.

296.     The second, third, fourth, and fifth factor all speak to the reasonableness of a defendant's litigation conduct and the impact of an award on future litigants. *See* ORS § 20.075(1)(b) (reasonableness of defenses); § 20.075(1)(c) (the extent to which award would deter others from asserting good faith defenses); § 20.075(1)(d) (the extent to which an award would deter others from asserting meritless defenses); § 20.075(1)(e) (the objective reasonableness of the parties and the diligence of the parties and the attorneys during the proceedings).

297.     Defendants' conduct in this case was unjustifiable. In addition to asserting defenses which had no basis in fact, (*Compare, e.g.*, Wang Declaration (ECF No. 148 ¶ 13) ("I have not had any connection with the company named Mirigen for approximately two years because it ceased operations in 2015.") *with* 2017 People's Republic of China State Administration for Industry and Capital report (ECF No. 162-4) (reflecting that Wang is Mirigen shareholder, legal representative, general manager and executive director) *and* Wang interrogatory response (ECF No. 136-20 at 5) ("I acted as technical consultant until June 2016")), Defendants repeatedly disobeyed the Courts orders and destroyed evidence. (*See* Spoliation Opinion and Order.) To the extent the conduct of future litigants could be impacted by an award of attorneys' fees, it would be to deter bad faith claims and defenses, not discourage meritorious litigation.

298.     The sixth factor, the "objective reasonableness of the parties in pursuing settlement," neither weighs in favor nor against awarding attorneys' fees. Although Defendants resisted engaging in settlement negotiations prior to the entry of default judgment, there is no

requirement that parties engage in settlement discussions and Defendants' conduct in this regard was stubborn but unremarkable.

299.    Taken together, the standard contained in ORS § 646.467 and the factors outlined in ORS § 20.075 both support an award of attorneys' fees.

c.    FRCP 37(b)(2)(C)—Fees and Costs

300.    Finally, even absent the Lanham Act and Oregon Trade Secrets Act, Plaintiffs would be entitled to attorneys' fees and costs related to Defendants' discovery order violations. *See* Fed. R. Civ. P. 37(b)(2)(C).

301.    Under Fed. R. Civ. P. 37(b)(2)(C), upon a finding that a party disobeyed a discovery order, a court "must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

302.    As outlined in the Court's Spoliation Opinion and Order, which documented and sanctioned Defendants' extensive destruction of evidence in violation of this Court's orders, Defendants' disobedience was not substantially justified. The Court is aware of no other circumstances not already addressed in its previous Opinion and Order which would make such an award unjust.

303.    Thus, even if Plaintiffs were not entitled to their attorneys' fees and costs under the Lanham Act and Oregon Trades Secrets Act, they could still recover any fees and costs incurred as a result of Defendants' discovery misconduct.

d.    Scope of Attorneys' Fees Recovery

304. The Court's award of attorneys' fees pursuant to the Oregon Trade Secrets Act and Lanham Act applies to the entire action and not just the individual claims under which the fees are authorized.

305. In an action "where the plaintiff presents different claims for relief that 'involve a common core of facts' or are based on 'related legal theories,' the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis." *McCown v. City of Fontana*, 565 F.3d 1097, 1103 (9th Cir. 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). Instead, the fee awards in such cases "[n]ormally . . . will encompass all hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435.

306. As outlined *supra*, Plaintiffs' claims are interrelated and involve a common core of facts. Plaintiffs are therefore awarded their reasonable fees for the entire case.

## 2. Reasonableness of Requested Attorneys' Fees

307. Having determined that Plaintiffs are entitled to their attorneys' fees for the entire matter, the Court now turns to whether the fees requested by Plaintiffs are reasonable.

308. Plaintiffs move for a total of $1,011,879.00 in attorneys' fees. Defendants do not raise any objections to the number of hours or proposed hourly rates submitted by Plaintiffs. The Court nevertheless conducts a careful review of the record to determine the reasonableness of Plaintiffs' claimed hours and rates.

### a. General Legal Standards

309. In awarding a reasonable attorneys' fee, courts apply the lodestar method to determine the reasonable hourly rate and then multiply that rate by the number of hours the attorney reasonably spent on the case. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). A "strong presumption" exists that the lodestar figure represents a "reasonable fee,"

and it should therefore only be enhanced or reduced in "rare and exceptional cases." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).

310.    A reasonable billing rate is determined based on the "prevailing market rate" in the relevant community. *Camachco v. Bridgeport Financial, Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). "The burden is on the [fee applicant] to produce evidence that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895-96 (1984).

311.    Courts review the billing hours submitted to determine whether the prevailing attorney could have reasonably billed the claimed hours to a private client. *Gonzalez*, 729 F.3d at 1202. Hours that could not reasonably be billed to a private client are not recoverable. *Id.* at 1203. "[E]xcessive, redundant, or otherwise unnecessary" hours are also not recoverable. *Id.* (quoting *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2008)). Non-clerical work performed by paralegals and law clerks, however, is recoverable as attorneys' fees. *Precision Seed Cleaners v. Country Mut. Ins. Co.*, 976 F. Supp. 2d 1228, 1247-49 (D. Or. 2013).

b.    Reasonableness of Rates

312.    Attorney Scott Davis seeks a rate of $425 per hour; Klaus Hamm a rate of $400 per hour; and Carla Todenhagen Quisenberry a rate of $310 per hour. (Hamm Decl. Ex. 25.) After careful consideration, the Court finds these rates to be reasonable.

313.    In general, the Court uses the Oregon State Bar's *2012 Economic Survey* as an initial benchmark for determining the reasonableness of a party's requested rates. These survey rates, however, are not compulsory and the Court agrees with Plaintiffs that the Survey is not the appropriate benchmark in the present case. (*See* Pls.' Motion for Fees and Costs 19-20.) Most importantly, the Survey offers no data on the rates charged by attorneys specializing in

intellectual property law and there is no data on the most analogous specialty, labeled Business/Corporate – Litigation, in the region where this Court sits. (Hamm Decl. Ex. 22 at 3.)

314.    The Plaintiffs instead propose that the Court look to the American Intellectual Property Law Association's ("AIPLA") *2015 Report of the Economic Survey*. (Hamm Decl. Ex. 21.) This survey reports on the billing rates for intellectual law attorneys and Plaintiffs point to a region labeled "Other West," which includes Oregon, Montana, Wyoming, Colorado, New Mexico, Idaho, Utah, Nevada, Washington, and parts of California, Alaska, and Hawaii. (*Id.* at 25.) Although the geographic region is broad, it provides the best available estimation of the rates attorneys of comparable skill and experience would charge in the locality.

315.    In particular, all three attorneys are specialists in intellectual property law with extensive intellectual property experience. Mr. Davis, who also possesses an M.S. in Chemistry, and Mr. Hamm are partners in their firm, each with more than fifteen years of experience, and Ms. Quisenberry was, at the time, an associate who possessed over ten years of relevant experience. The case required work on a range of intellectual property issues including copyright, trade secrets, and false advertising, as well as attention to the implications of conduct on multiple continents and under multiple legal regimes. These were not simple legal issues and a client in the locality would be required to compensate their attorneys in a manner commensurate with their level of specialized knowledge and relevant legal experience.

316.    Turning to proposed rates, AILPA's survey indicates that the median 2014 billing rate in the region for intellectual property attorneys working as partners at private firms was $400 and the 75th percentile rate was $478. (Hamm Decl. Ex. 21.) The median 2014 billing rate in the region for intellectual property attorneys working as associates at private firms was $300 and the 75th percentile was $347. (*Id.*) Mr. Hamm's rate sits precisely at the median and is

therefore reasonable. Mr. Davis's rate is $25 above the median hourly rate, but he also possesses an additional technical degree and two more years' experience than Mr. Hamm. The rate is also comfortably below the 75th percentile rate. As such, the Court finds Mr. Davis's rate to be reasonable. Finally, Ms. Quisenberry's rate is $10 above the median hourly rate, though still well below the 75th percentile hourly rate. Given Ms. Quisenberry's ten years of experience, surely at the upper end of that possessed by a typical associate, the Court finds her rate to be reasonable.

317.    By contrast, the Court finds the submitted paralegal rates to be out of step with the prevailing market rate in the community.

318.    Paralegal Jeanette Warner seeks a rate of $150 per hour; Mung Conway a rate of $160 per hour; and Xuan-Giang Tran a rate of $175 per hour.

319.    Plaintiffs provide no supporting declarations, survey data, or even description of specific qualifications to justify these rates. *See Blum*, 465 U.S. at 895 n.11 ("To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."). The only supporting material is a citation to a previous case in the District where the court approved paralegal rates ranging from $90 to $175. (Pls.' Motion for Fees and Costs 21 (citing *Prison Legal News v. Columbia Cty.*, No. 3:12-cv-0071-SI, 2014 WL 1225100, at *7-9 (D. Or. Mar. 24, 2014).) The approved paralegal rates in *Prison Legal News*, however, were for work in a different locality, Portland, and were supported by descriptions of each paralegal's level of experience. 2014 WL 1225100, at *7. Indeed, the only paralegal receiving $175 in that case was also an investigator—the highest rate for exclusively paralegal work was $125 and

received by a "senior paralegal." *Id.* Here, by contrast, Plaintiffs have submitted no information about the experience, technical skills, or language skills possessed by any of the paralegals.

320.    As such, the Court looks to the National Legal Assistant Association's *2016 National Utilization & Compensation Survey Report* to identify the appropriate rate. In the region labeled "Far West," which includes Oregon, Washington, California, Nevada, Hawaii, and Alaska, the mean billing rate for paralegal work in 2016 was $146 per hour. This is likely a generous benchmark given that, unlike the AIPLA survey, larger cities like Los Angeles and San Francisco are included in the relevant regional calculation.

321.    Other courts in the District have lowered applicants' requested paralegal rates where applicants failed to provide evidence as to paralegals' training and experience. *See, e.g.*, Investors VII, LLC v. BBP One LLC, No. 3:16–cv–01595–SB, 2017 WL 706628, at *4 (D. Or. Jan. 30, 2017) (reducing paralegal rate from $195 and $135 to $125); *Whitworth v. Nat'l Enter. Sys.*, No. CV 08–968–PK, 2010 WL 1924505, at *11 (D. Or. April 21, 2010) (reducing paralegal rate from $130 to $90); *Van Dyke v. BTS Container Service*, No. CV 08–561–KI, 2009 WL 2997105, at *2 (D. Or. Sept. 15, 2009) (reducing unopposed paralegal fee from $125 to $100); *Atl. Recording Corp. v. Andersen*, No. CV 05–933–AC, 2008 WL 2536834, at *16 (D. Or. June 24, 2008) (reducing paralegal rate from $150 to $120).

322.    On the other hand, courts in the District have awarded unopposed paralegal rates of $125 per hour. *See, e.g.*, *Salinas v. Beef Nw. Feeders, LLC*, No. CV–08–1514–PK, 2010 WL 1027529, at *9 (D. Or. Mar. 1, 2010); *Megavail Inc. et al v. Ill. Union Ins. Co.*, No. CV 05–1374–AS, 2007 WL 3232605, at *4 n. 2 (D. Or. Nov. 1, 2007).

323.    Here, because Plaintiffs provide no evidence of the paralegals' training or experience, the Court lowers all of their rates to $125 per hour. This is a reasonable rate.

c. Reasonableness of Hours

324.    Attorney Scott Davis seeks fees for 770.40 hours of work; Klaus Hamm 1,210.70 hours of work; and Carla Todenhagen Quisenberry 336.70 hours of work. (Hamm Decl. Ex. 24.) Paralegal Jeanette Warner seeks fees for 116.40 hours of work; Mung Conway 37.70 hours of work; and Xuan-Giang Tran 413.20 hours of work. (*Id.*) The total number of hours expended on the matter is 2,885.10. (*Id.*)

325.    The Court has carefully reviewed the submitted time sheets and finds that the requested hours are reasonable.

326.    The entire action spanned over 18 months. (*See* Hamm Decl. Ex. 24.) This was a complicated matter and involved significant wrangling—legal, evidentiary, and tactical—throughout the action. Plaintiffs were forced to reassess their strategy on multiple occasions based on the misconduct and frivolous counterclaims of Defendants. The case was further complicated by the transnational nature of Defendants' actions and the legal issues giving rise to the suit and its resolution. Plaintiffs were, moreover, successful in virtually every aspect of the litigation, securing a default judgment, dismissal of counterclaims, and much of their requested relief. As the Court noted at oral arguments on the issues of damages and fees, Plaintiffs were, for the most part, extremely well organized and professional in their handling of the case.

327.    Defendants have raised no objections to the number of hours expended by Plaintiffs and, on the face of Plaintiffs' time sheets, the Court finds these hours to be reasonable.

## III.    **CONCLUSION**

Based on the foregoing, Plaintiffs are entitled to the injunctive relief outlined in paragraphs 268 to 280, total damages in the amount of $2,807,750.00, attorneys' fees in the amount of $986,989.50, and costs in the amount of $57,030.67.

IT IS SO ORDERED.

DATED this _16th day of November, 2017.

s/ Michael J. McShane
Michael J. McShane
United States District Judge